OPINION
Timothy Coleman appeals from the Clark County Common Pleas Court's denial of his post-conviction relief petition which sought to vacate his death penalty conviction.
Coleman was convicted of the capital murder of Melinda Stevens on February 21, 1997. On November 2, 1997 Coleman filed his post-conviction petition which he amended three times. The trial court dismissed his petition on May 31, 2001, without an evidentiary hearing. This appeal followed.
The facts underlying Coleman's conviction are set out in the Ohio Supreme Court's opinion in State v. Coleman (1999), 85 Ohio St.3d 129 in which the supreme court affirmed his conviction and sentence. The facts need not be repeated here.
In his first assignment, Coleman contends the trial court erred in denying him an evidentiary hearing. In the second assignment, Coleman contends Ohio's post-conviction process violates the due process and equal protection provisions of the Fourteenth Amendment.
Coleman alleged a number of claims that his trial counsel were ineffective in representing him. (Claims 3-21). In Claim 3, Coleman contends his trial counsel were ineffective in not filing a motion to review grand jury transcripts to determine if the prosecution presented a murder weapon as evidence to the Clark County Grand Jury without presenting it as evidence at his trial. In support of this claim, Coleman submitted his own affidavit in which he stated "I was also told that the prosecutor showed the grand jury a gun which he stated was the actual weapon used to kill Melinda Stevens. The police, however, never received the crime weapon."
The State presented the affidavit of Prosecuting Attorney Stephen A. Schumaker, who stated that no weapon was ever presented to the grand jury nor was any weapon ever recovered by law enforcement.
In overruling this ground for relief, the trial court stated:
 "Defendant's third ground for relief alleges that trial counsel was ineffective for failing to properly investigate his need for grand jury transcripts. The substance of the defendant's claim is that a gun, alleged to be the murder weapon, was presented to the grand jury. However, the State never claimed to have found the murder weapon nor was a murder weapon ever produced at trial. Defense counsel could not be expected to examine something that was never found. Unsubstantiated speculation is insufficient to establish substantial grounds for relief. Defendant's third ground for relief is DENIED."
In reviewing a petition for post-conviction relief filed pursuant to R.C. 2953.21, a trial court may, in the sound exercise of discretion, judge the credibility of the affidavits in determining whether to accept the affidavits as true statements of fact. State v. Calhoun (1999),86 Ohio St.3d 279. The trial court apparently credited the affidavit of the prosecutor that no weapon was ever presented to the grand jury and apparently discredited Coleman's claim that his lawyer told him a murder weapon was presented as evidence at the grand jury. The trial court apparently found it illogical that the State would present the alleged murder weapon as evidence at the grand jury but not at trial. We see no error in the court's resolution of Coleman's third claim for relief.
In his fourth ground for relief, Coleman argues that his appointed trial counsel Jon and James Doughty were constitutionally ineffective for permitting a juror to sit on his case who had disclosed in his questionnaire that he was "related to or a close friend of" the county prosecutor or his staff. In support of this claim, Coleman submitted a copy of the questionnaire. (Defendant's Exhibit 13). The juror, Jesse A. Wilkerson disclosed that he was 21 years old and was of the African American race. Wilkerson answered yes to the question of whether he was related to or was a close friend of the County Prosecutor or a member of his staff.
The State argued that Coleman failed to make out a claim for ineffectiveness on this claim because Wilkerson consistently stated he would be fair and impartial and that counsel may have wished to keep him on the jury because he was a young, African-American male like Coleman. The State noted that Coleman's counsel objected to the State's use of peremptory challenges to some black jurors leaving Wilkerson as the only black juror.
The trial court denied Coleman's fourth claim because there was no evidence that Wilkerson would be anything but fair and impartial and counsel may have wished to have a young black man serve on the jury. We agree with the trial court that it is certainly within the range of reasonable representation for Coleman's counsel to have concluded that Wilkerson's relationship with the prosecutor's office was outweighed by the desire of having at least one black juror on the jury. (The record indicates Coleman was a 26 year old black male at the time of his arrest). The Supreme Court has noted that it will not second guess strategies employed during voir dire. State v. Coleman, supra at 133. The trial court properly overruled this claim wihout a hearing.
In his fifth claim, Coleman asserted that his counsel were ineffective for failing to meet with his prior counsel who had conducted an investigation of his murder charge, failed to investigate information in prior counsel's files, failed to conduct follow up investigations of witnesses, and failed to adequately interview him. In aid of this claim, Coleman submitted the affidavit of John Juergens. Juergens was representing Coleman on drug charges when Coleman was charged with the capital murder of Belinda Stevens. Juergens stated he did some preliminary investigation of the murder charge although he was not representing Coleman on those charges. Juergens said he turned his investigation file over to the Doughtys, Coleman's appointed lawyers in the murder case. He said he never heard from the Doughtys.
Coleman also alleged that the Doughtys were ineffective because they only called two witnesses in his defense in the guilt phase of the trial. Coleman also alleged the Doughtys were ineffective in waiting to hire a private investigator until the eve of trial. He also contended there was no evidence that the Doughtys interviewed those persons who gave statements to the police who were not called to testify for the State. Lastly, he contended the Doughtys did not interview him about his defense until the day of trial.
In response the State submitted the affidavit of Jon Doughty who stated he did not recall receiving any information from John Juergens regarding the murder investigation. He said he and his father, James Doughty, spent at least 60 hours with Coleman prior to the trial preparing for the guilt and mitigation phases of the trial.
The trial court overruled this claim because it found that the Doughtys' failure to meet with Juergens could not have affected the outcome of Coleman's trial.
We agree with the State that the trial court properly overruled Coleman's fifth claim for relief. Coleman presented no evidence that Juergens had any material from his investigation which may have been useful in affecting the outcome of Coleman's trial. Jon Doughty stated that he and his father spent sixty hours with Coleman preparing for the trial. The trial court again apparently simply found Coleman's claim to be incredible. State v. Calhoun, supra.
In his sixth claim, Coleman claimed that the Doughtys were ineffective because they did not present certain alibi testimony at his trial. Specifically Coleman alleged in his petition that he was with Dana Strodes at Fayette Strode's house between 6:30 p.m. and sometime the next day January 3, 1997 and therefore could not have killed Melinda Stevens who was killed near 7:20 p.m. on January 2, 1997.
In support of his claim, Coleman submitted the affidavit of Dana Strodes. Ms. Strodes stated that Coleman was her boyfriend in December and January 1996 and Coleman fathered a child by her. Ms. Strodes said she met Coleman at her grandmother's house on South Jackson Street in Springfield at about 6:30 p.m. on January 2, the night of the murder. She said she was with Coleman from that time until the next day. She said she watched television with Fayette Strodes, Gary Strodes and James Strodes at her grandmother's house. Dana Strodes stated that she was never contacted by any member of the defense team, but she would have been willing to testify on Coleman's behalf. Coleman also submitted the handwritten notes made by Detective Jeffrey Flores of an interview Flores had with Dana Strodes on February 7, 1996. (Def. Ex. 30). In the notes, Flores says Strodes told him that Coleman came to the Strodes' house when Wheel of Fortune was on television (7:00 p.m.) and she did not know how he got there. Coleman also submitted the notes of Detective Sergeant Al Graeber (Def. Ex. 31). In these notes, Graeber notes on February 7, 1996, Dana Strodes told him that Coleman came to her grandmother's house during the Wheel of Fortune show.
The State submitted the affidavit of Jon Doughty who stated that Coleman never indicated to him that he had an alibi on the night of the murder. Doughty said Coleman's story to him was consistent with what he told Detective Graeber on the day following the murder and he never mentioned Dana Strodes as a possible defense witness. The State noted that Coleman admitted to Detective Graeber that he was with Melinda Stevens between 7 and 7:15 p.m. on the night of the murder at Riddle's Ribs just shortly before her body was discovered by EMT personnel.
In its motion for summary judgment, the State argued the sixth claim should be overruled because Coleman never told his lawyers about his potential alibi. More importantly, the State also noted that Coleman told Graeber that he was with Melinda Stevens between 7 and 7:15 p.m. on the night of the murder. The State also notes that Coleman admitted that he went to Riddle's and purchased chicken wings for Melinda shortly before her body was discovered. (Coleman's affidavit did not indicate the time he went to Riddle's with Stevens).
In overruling Coleman's sixth claim, the trial court stated the following:
 "Defendant's sixth ground for relief alleges ineffective assistance of counsel for failure to present alibi testimony. However, the purported alibi conflicts with defendant's own statements made to Detective Graeber with respect to defendant's location on the evening in question. Defendant's statements to the officers were consistent with his statements to counsel. Presenting the alleged alibi, which appears untrue from the conflicting affidavits and defendant's own statements, could have resulted in more harm than help.
 "The alibi is contained in the affidavit of Dana Strodes. Dana Strodes claims the defendant was with her from 6:30 p.m. on the night in question until the next morning. Defendant's own statements to Detective Graeber was that he was at Riddle's Ribs at 7:00 p.m. and at a pay phone at 7:30 p.m., Defendant's statements contradicts his alibi.
 "The alibi also conflicts with the statements of the witnesses, Hope Strodes, Vera Strodes, Fayette Strodes and Lynnda Gaskins. Therefore, defendant's sixth ground for relief has no legitimate grounds and is DENIED."
The trial court rejected Coleman's sixth claim because it found Dana Strodes' affidavit to be false in light of other evidence presented at trial. In Calhoun, the Supreme Court stated the court should consider all relevant factors in assessing the credibility of affidavit testimony in so-called paper hearings. The court said a factor to consider is whether the judge reviewing the petition also presided at the trial, whether the affiant is a relative or otherwise interested in the success of the petitioner's efforts, and whether the affidavits contradict evidence offered at trial by the defense.
In this case the same judge presided at trial and over the petition. The affidavit was provided by Coleman's girlfriend at the time of the murder who certainly was interested in the success of Coleman's efforts. Also Coleman did not rebut Doughty's affidavit that Coleman did not tell him that Dana Strodes could provide an alibi for him. Hope Strodes, Vera Strodes, Fayette Strodes, and Lynnda Gaskins all testified at the trial that Coleman arrived at the Strodes' house as "Wheel of Fortune" was ending just before the Ohio Lottery came on at 7:30 p.m. This testimony is consistent with Coleman's taped statement to Detective Graeber that he was with Melinda Stevens between 7:00 and 7:15 pm. "cause I didn't get to play my numbers." (Tr. 981). We see no error in the trial court's denial of Coleman's sixth claim without an evidentiary hearing.
In his seventh claim, Coleman contended that his counsel were ineffective in not investigating allegations that police improperly influenced Kinsley Crowley, Larry Terrell, William Love, and Dana Strodes to lie in order to implicate him in the murder of Melinda Stevens. Coleman presented the affidavit of Kinsley Crowley, an inmate, who stated in an affidavit dated October 30, 1997, that Detective Smoot told him "he would help me for my time if I said I saw Tim kill Melinda." (Def. Ex. 10).
In its motion for summary judgment, the State presented the affidavit of Detective Nathaniel Smoot who swore he never threatened any witness to testify in a certain manner, nor to influence their testimony by any promises of leniency. The State also presented the typed interview of Crowley conducted by Detective Smoot and Flores on January 10, 1996. In the interview Crowley stated he saw Coleman and his cousin Melinda Stevens leave Riddles together about five minutes before Chris Holtz discovered Melinda's dead body. The State asserted in its motion that no criminal charges were pending against Crowley at the time he made his statement to the Springfield detectives in January 1996.
Coleman submitted the affidavit of Larry Terrell who was incarcerated with Coleman in the county jail from January to May 1996. Terrell stated that Detective Smoot asked him if Coleman came by to pick up James Strodes to help him kill Melinda Stevens. He said he denied any knowledge that Coleman was with Strodes the night Melinda was murdered. In its notes, the State notes there was no claim by Terrell that Smoot tried to improperly influence Terrell to implicate Coleman in the murder.
Coleman presented the affidavit of William Love who stated in an affidavit dated December 22, 1997, that he was an inmate in the Clark County Jail in 1996 and was told by an unnamed inmate that inmates' sentences would be reduced if they testified against Coleman. He stated he heard a younger inmate agree to help out and later detectives took him out and interviewed him. He stated he didn't know whether the prosecution or police actually did offer such a deal to anyone.
Coleman offered the affidavit of Dana Strodes dated November 19, 1997. In it Strodes stated she called the police on a date unspecified for assistance in a domestic argument. She said the police told her they wanted to get Tim Coleman and asked her to file domestic violence charges against him even though the charges weren't warranted. The State offered the affidavit of Jon Doughty who stated that no one ever contacted him with concerns that Detective Smoot or any police officer ever tried to influence their testimony.
In granting summary judgment on Coleman's seventh claim, the trial court noted that the record failed to disclose any substantial facts to support this allegation of ineffectiveness on counsel's part. We agree that the record fails to establish any evidence that police sought to improperly influence any of the witnesses who offered their affidavit or that the Doughtys were ever aware of any such claim of misconduct by the police. The trial court properly overruled the seventh claim without an evidentiary hearing.
In his eighth claim Coleman contends his trial counsel were ineffective because they admitted to John Stojetz that they hurried through Coleman's case so they could begin work on his case. In support of this allegation, Coleman submitted the affidavit of John Stojetz (Def. Ex. 14). In the affidavit Stojetz stated he was represented by the Doughtys in a capital murder case and during a recess he said he asked Jon Doughty if he thought he might get the death penalty. Stojetz said Doughty replied, "No, Coleman was a typical stupid nigger." He said Doughty said Coleman told several people in a bar that "he killed the bitch, she won't tell on me no more." Stojetz said Doughty said in light of Coleman's remarks he "just went through the motions" with the Coleman case. Stojetz said Doughty told him he wanted the Coleman case finished so he could begin work on his trial. The State countered with Jon Doughty's affidavit wherein he stated he spent between 350-400 hours working on Coleman's case. Doughty emphatically denied all of Stojetz's allegations.
In denying the eighth claim, the trial court noted that Stojetz is a convicted felon on death row for the murder of a prison inmate and the Doughtys were his counsel and he had an obvious reason to further his position. The court stated that it found Stojetz's statements suspicious and without credibility. The court fully credited Doughty's affidavit and noted that any inconsistencies in the state's evidence were identified.
Again State v. Calhoun is a basis for overruling Coleman's claim. The trial court was in the best position to view the conduct of trial counsel and whether counsel appeared adequately prepared to address the State's case and to present evidence in Coleman's behalf. The eighth claim was properly denied without a hearing.
In his ninth claim, Coleman contended that his trial counsel were ineffective in not arguing residual doubt to the jury in the guilt phase of the trial. Specifically, Coleman contends his counsel did not argue that other people who Melinda Stevens informed the police about had an equal motive to end Melinda's life, did not point out the lack of fingerprints tests on the K-Swiss shoes allegedly worn by him and did not point out lack of DNA evidence or credible physical evidence connecting him to the crime.
The State argues that it would have been ludicrous for counsel to have argued the presence of "residual doubt" during the guilt phase of the trial because such an argument concedes the lack of reasonable doubt.Franklin v. Lynaugh (1988), 487 U.S. 164, 188. (Residual doubt is a "lingering uncertainty about facts, a state of mind that exists somewhere between `beyond a reasonable doubt' and `absolute certainty'").
In the direct appeal, Coleman asserted that his counsel was ineffective for not pursuing a substantial number of leads pointing to another killer. The Supreme Court found this claim to be baseless. State v.Coleman, supra, at 134. Nothing in the post-conviction evidentiary material suggests counsel was ineffective in not pursuing other "leads." The trial court properly rejected Coleman's ninth claim as well.
In his tenth claim, Coleman argued his counsel were ineffective in not conducting an adequate investigation into Coleman's background for mitigation evidence.
In support of this claim, Coleman submitted the affidavit of Dana Strodes. (Def. Ex. 19). In her affidavit she said that had the Doughtys talked to her, she would have been willing to testify that Coleman loved and cared for his son and that he was never violent towards her. She would also have said he was a good father. Coleman argued that Athea Martin and Susan Smith, both who had a child by Coleman, would have provided similar testimony. Coleman argued that the testimony if offered in the mitigation phase of the trial was crucial given the fact there was residual doubt whether he committed the crime.
In opposition, the State presented the affidavit of Detective Jeffrey Flores who stated that Dana Strodes told him that Coleman shot her in 1992.
In overruling the tenth claim, the trial court found that the record did not support Coleman's claim that further investigation by counsel would have produced any more mitigating evidence than the testimony of Coleman's father.
In State v. McGuire (1997), 80 Ohio St.3d 390, the Supreme Court held that residual doubt is no longer a mitigating factor. In any event, the court held the overwhelming evidence of Coleman's guilt precluded the presence of residual doubt. The court also held that the trial record did not support Coleman's speculation that further investigation would have produced significant mitigating evidence. The court noted the fact that Coleman fathered several children from different women without marrying them was hardly mitigating. The court noted that the "failure to present mitigating evidence . . . does not in itself constitute proof of ineffective assistance." State v. Coleman, 85 Ohio St.3d 129, 138, citing its previous case of State v. Hamblin (1988), 37 Ohio St.3d 153. In this case trial counsel may not have wished to diminish the poignant testimony of Coleman's father with the testimony of the women who Coleman had impregnated but never married. Finally, to show prejudice from counsel's failure to present mitigating evidence there must be a reasonable probability that the evidence would have swayed the jury to impose a life sentence. State v. Keith (1997), 79 Ohio St.3d at 536. Assuming Dana Strodes, Athea Martin, and Susan Smith all testified that Coleman was a good father and was never violent toward them, it is highly improbable the jury would have been swayed to impose a life sentence in light of the jury's finding that Coleman had virtually executed Melinda Stevens in retaliation for her informant activities. The tenth claim was properly rejected by the trial court.
In his eleventh claim, Coleman contends his counsel were ineffective in the mitigation phase by not calling his mother and sister to testify in his behalf. In support of this claim Coleman presented the affidavits of Sonja Coleman, his sister, and Eula Coleman, his mother.
In her affidavit, Sonja Coleman said her brother's behavior began to worsen around his eighteenth birthday and he moved out of their family home on several occasions. She said her brother was working at the time of his arrest for the murder and appeared to be financially supporting his children. She said she was never contacted by her brother's attorneys. Eula Coleman said her son was a happy and friendly child. She said her son had difficulty in school because of a learning disability. She said her son became rebellious when he was 17 or 18 years of age. She said she met with Jon Doughty at his office to speak with Dr. Erhard Eimer, a psychologist. She said she did not meet with the Doughtys prior to the trial to discuss her son's case.
The trial court overruled this claim noting that the record at trial established that Eula Coleman could not testify at the mitigation hearing because she was too upset. The court noted that Sonja's testimony was merely cumulative to that of her father's and there was no likelihood that the outcome of the sentencing hearing would have been different if counsel had presented her testimony. We agree with the trial court's resolution of this claim as well. Counsel can hardly be faulted for not calling Eula Coleman to the stand after she indicated she was too upset to testify. The following occurred at the trial:
"Q. Now, Mrs. Coleman is here?
"A. Yes, she is.
"Q. Your wife, is that true?
"A. Yes.
 "Q. And she's sitting out in the hall, but I understand she doesn't want to testify. Would you tell the jury why.
 "A. My wife — Timothy and his mother, are very, very close. And being a mother, a caring mother, she have taken this — this situation very seriously and have upset her. I would probably say her blood pressure is a little high at the moment. She's having a hard time sleeping. She's having a hard time trying to cope with this.
 "Never — she never would have imagine that he would have — anything like this would have ever happened, you know. So that's why she don't want to testify, in fear that she may lose control or break down or, you know, or upset Tim or, you know, whatever.
"MR. JAMES DOUGHTY: Thank you. Do you have any questions?
 "MR. SCHUMAKER: State would have no questions for Mr. Coleman, Your Honor.
"THE COURT: Thank you, Mr. Coleman."
The trial court properly overruled Coleman's eleventh claim without providing him an evidentiary hearing.
In his twelfth claim, Coleman argues that his trial counsel were ineffective in not presenting the testimony of Dr. Earhard Eimer, a clinical psychologist during the mitigation phase of the trial. In his affidavit, Dr. Eimer stated he was retained in January 1997 by the Doughtys to evaluate Tim Coleman. Dr. Eimer said he interviewed Coleman on four separate occasions for a total of some 8.25 hours. Dr. Eimer said he conducted three clinical tests and determined that Coleman had a Compulsive Personality Disorder. Dr. Eimer said Coleman obtained remarkably low scores for personality disorders that would be typical of persons likely to engage in violent crimes against persons. He said that the diagnostic indications emerging from Coleman's tests counter-indicate any other personality disorder, particularly those associated with a tendency to engage in violent crimes.
Further Dr. Eimer said there were three factors which speak against the notion that Tim Coleman might have engaged in a violent crime: (1) his upbringing in a morally well-integrated family, (2) no indication of impulsiveness or aggressiveness on Coleman's part even when acutely challenged, and (3) tendencies to worry and be fearful and not to be manipulative consistent with a personality that is not of a violent nature.
The State argued that it was professionally reasonable for the Doughtys not to have put Dr. Eimer on the stand in the mitigation phase of the trial because his opinion was not admissible and in any event would have alienated the jury given the doctor's opinion that Coleman's personality was inconsistent with violent conduct. Also the State argued that Eimer's findings that Coleman typically does not assume responsibility for his problems and tends to blame others were consistent with Coleman blaming Melinda Stevens for his problems with the law which was the motive for the killing.
The trial court overruled this claim adopting the State's position in every respect and we agree with the trial court's disposition of this claim as well. In light of Dr. Eimer's views that Coleman typically blames others for his conduct, it is doubtful Dr. Eimer's testimony would have been helpful. In any event, trial counsel must be accorded substantial deference in making these judgments even in death penalty cases. There also seems little likelihood Dr. Eimer's testimony would have provided substantial mitigation to the crime committed by Coleman. The trial court properly overruled Coleman's twelfth claim.
In his thirteenth claim, Coleman contended the Doughtys were ineffective in not having Deputy Steven Williams testify in the mitigation hearing. Williams stated in his affidavit that he transported Coleman to and from jail during the capital trial and "at no time during the six day trial, did I observe Mr. Coleman misbehave or present any kind of resistance while under my supervision." (Ex. 25). In support of his claim Coleman refers us to the United States Supreme Court case ofSkipper v. South Carolina (1986), 476 U.S. 1, wherein the court held that it was error to exclude evidence in the sentencing hearing of two jailers and a "regular" visitor that the defendant had made a "good adjustment" during the 7 1/2 months he had spent in jail between arrest and trial. Justice White wrote the following on behalf of the court:
 "Finally, the State seems to suggest that exclusion of the proffered testimony was proper because the testimony was merely cumulative of the testimony of petitioner and his former wife that petitioner's behavior in jail awaiting trial was satisfactory, and of petitioner's testimony that, if sentenced to prison rather than to death, he would attempt to use his time productively and would not cause trouble. We think, however, that characterizing the excluded evidence as cumulative and its exclusion as harmless is implausible on the facts before us. The evidence petitioner was allowed to present on the issue of his conduct in jail was the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnesses — and, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges — would quite naturally be given much greater weight by the jury. Nor can we confidently conclude that credible evidence that petitioner was a good prisoner would have had no effect upon the jury's deliberations. The prosecutor himself, in closing argument, made much of the dangers petitioner would pose if sentenced to prison, and went so far as to assert that petitioner could be expected to rape other inmates. Under these circumstances, it appears reasonably likely that the exclusion of evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence. Thus, under any standard, the exclusion of the evidence was sufficiently prejudicial to constitute reversible error." (Emphasis added).
In this case the prosecutor gave a very brief argument in support of the death penalty. The prosecutor argued the specification of the aggravated murder of a witness outweighed any mitigating evidence presented by the defendant. We agree with the State's position that even if counsel had presented the testimony of Deputy Williams, there is no reasonable probability that the jury's sentence would have been different. Strickland v. Washington, supra. The trial court properly overruled Coleman's thirteenth claim.
In his fourteenth claim, Coleman contends the Doughtys were ineffective in not presenting a cultural expert who could have helped the jury understand why he turned to a life of drug dealing despite the fact that he had a stable family life. In overruling this claim, the trial court stated that such testimony would not mitigate the fact that Coleman executed the mother of five children and in any event, even if mitigating, would not have overcome the aggravated circumstances presented by the State. We agree that such testimony would not present a reasonable probability of a different sentence than that imposed by the jury. The trial court properly overruled the fourteenth claim without an evidentiary hearing.
In his fifteenth claim, Coleman contends the Doughtys were ineffective in the sentencing phase of the trial by not presenting the mitigating testimony of his mother, his sister, his girlfriends, a deputy sheriff, and the psychologist who evaluated him. He also argues his counsel were ineffective in not introducing employment records that he was gainfully employed at Fox Lite, Inc. days before the crime occurred. Also he argues counsel gave a woefully weak closing argument in the mitigation phase of the trial.
In support of this claim, Coleman submitted Exhibit 33 which were Fox-Lite employment records indicating that Coleman worked as an assembler from November 12, 1995 until February 5, 1996 when he was laid off for lack of work. The trial court overruled this claim again finding nothing in the claim that suggested a reasonable possibility that the sentence imposed upon Coleman would have been different had this mitigation evidence been presented.
The Doughtys could hardly be faulted for failing to call Mrs. Coleman to the stand when the record disclosed she was too distraught to testify. The claim that counsel's final argument was weak was a claim properly asserted in the direct appeal not in a post-conviction proceeding. The only additional argument raised herein was counsel's failure to introduce Coleman's employment records which indicate he was working for three months prior to the homicide. The trial court properly denied this claim without an evidentiary hearing because there is no reasonable probability that the jury would have found this additional mitigating evidence would have outweighed the aggravated circumstance.
In his sixteenth claim, Coleman contended that the cumulative impact of the litany of counsel's errors rendered Coleman's capital proceedings unconstitutional. Coleman noted that his counsel failed to form a meaningful relationship with him, failed to properly investigate his innocence claims, failed to properly prepare to cross-examine the State's witnesses, failed to adequately conduct voir dire, failed to properly obtain grand jury transcripts, failed to properly present mitigating evidence, and failed to present a cogent closing argument in his behalf.
The State argued below and in this court that since none of the claims had individual merit, they can have no strength in the aggregate. The trial court found the State's argument persuasive and we do also. The trial court found many of Coleman's claims to be based on incredible testimony and applied the Calhoun case to its disposition of the claim. Other claims challenged tactical decisions by counsel and other claims, even if accepted as true, did not suggest a probability that the outcome of Coleman's trial would be different had counsel acted as Coleman claimed they should have. The trial court properly overruled Coleman's sixteenth claim as well.
In his seventeenth claim, Coleman contends his counsel was ineffective in not effectively impeaching Christopher Holtz who placed him in the alley with Ms. Stevens just prior to her death. In support of that claim, Coleman offered Defendant's Exhibit 45 which purports to be a statement given by Holtz to police. It is not clear who prepared the handwritten statement. It appears to have been prepared by someone other than Holtz. It starts "Chris saw a man. . . ." Holtz apparently described the man with Melinda Stevens as being 6 foot or better and 200-230 lbs. Coleman contends he is shorter and heavier than that and his counsel should have impeached him on this discrepancy. He also says counsel should have brought out on cross-examination that Holtz did not identify him though he knew him. Coleman refers us to page 847 of the transcript. The following testimony was given by Holtz at trial:
 "Q. And can you tell the Jurors how you knew Miss Stevens?
"A. How I knew her?
"Q. Yeah. How long had you known her?
 "A. Oh, not very long. I just see her wandering around a couple times through an alley.
"Q. Okay. Do you know an individual by the name of Tim Coleman?
"A. Not closely.
"Q. Okay. Do you know who he was?
"A. Yeah.
 "Q. Okay. Now, when you were in the vicinity of Riddle's Ribs, did you have occasion to see either of those individuals?
"A. In Riddle's."
The trial court overruled this claim finding there was no evidence that counsel's actions prejudiced Coleman. We have reviewed the record and we agree with the court's resolution of this claim as well. There is no evidence that Exhibit 45 is Holtz's statement to the police. There is no evidence that Coleman's height or weight differs significantly from that allegedly given by Holtz to police. The trial testimony does not plainly indicate that Holtz knew Coleman or Stevens by name. It does suggest Holtz knew them from seeing them in the vicinity of Riddle's. Coleman failed to demonstrate that counsel was ineffective in not properly impeaching Holtz such that an evidentiary hearing was necessary.
In his eighteenth claim, Coleman contends his trial counsel were ineffective in not impeaching the trial testimony of Lynda Gaskins. Ms. Gaskins testified at the trial that she had known Coleman for about 8 or 9 years prior to the trial and saw him almost daily. Ms. Gaskins said Coleman told her while he was in jail on the drug charges he learned through the discovery process that the confidential informant who he had sold the drugs to was Melinda Stevens. (Tr. 1120). Ms. Gaskins testified that when Coleman got out on bond he told her that he was going to kill Melinda Stevens because he was facing too much time on the aggravated trafficking charges. (Tr. 1123, 1124). Ms. Gaskins said Coleman came to her house on the night of the homicide at about 7:30 p.m. and told her that he "took care of my business." (Tr. 1129). She testified as follows:
 "A. Excuse me. He — he said — he said, `I took care of my business.' He said, `Bloop, bloop, two to the back of the head.' He said, `The bitch fell like a rock. Bloop' Then he fell in the middle of my floor.
 "Q. Wait a minute, now. He said, `Bloop, bloop.' Then he said, `The bitch' —
 "A. `Two to the back of the head.' And then he fell in the — then he just fell over in the floor, said, `She fell like a rock.'
 "Q. Said she fell like a rock, and he actually physically fell to the floor?
"A. Yes."
Gaskins testified that Coleman told her he shot Stevens twice in the back of the head in the alley behind Riddle's. (Tr. 1136).
In aid of his petition, Coleman filed a copy of Gaskins' statement to the police on April 5, 1996. In her statement she said Coleman told her Stevens was the informant who bought the drugs from him but "I never did get to find out how he got this information." In her lengthy statement Gaskins told police that Coleman explained he took care of his business, "Pow, pow. Twice to the back of the head with a nine."
Coleman contends his trial counsel were ineffective in not impeaching Gaskins with the statement she gave to the police in April 1996. The trial court overruled this claim finding that the claimed inconsistencies were insubstantial and in any event there was no reasonable probability that the outcome of Coleman's trial would have been different had counsel pursued this line of impeachment in cross-examination.
It is clear that Gaskins' trial testimony that Coleman said he learned of Stevens' identity through the discovery process in his drug case was not consistent with her police statement. Gaskins' trial testimony of how Coleman described the killing of Stevens was substantially consistent with her police statement. We doubt whether the single inconsistency in Gaskins' testimony would have had any significant impact on the jury's evaluation of her testimony. The trial court properly overruled this claim as well.
In his nineteenth claim, Coleman contends his trial counsel were ineffective in failing to impeach Steve Kasler with a prior statement he gave to police. Kasler testified at the trial that he was a cell mate of Coleman at the Columbus Reception Center for a day. He testified that Coleman told him he shot Melinda Stevens twice in the back of the head with a Davis P-380. (Tr. 1106). He denied he was receiving any consideration from the State of Ohio for his testimony.
In a statement given by Kasler to police on June 20, 1996, Kasler said the informant was white. Coleman contends counsel should have impeached Kasler with this statement since Melinda Stevens was an African-American. Coleman says counsel should have impeached Kasler with his statement that Coleman told him he talked to Edward Tilley before and after the killing since he did not mention this in his trial testimony. Coleman says counsel should have impeached Kasler with his statement that Coleman told him his nephew was to be his alibi since Coleman's nephew did not testify at trial.
We agree with the trial court's resolution of this claim as well. This claim is difficult to comprehend. While counsel might have impeached Kasler with his prior statement that Coleman told him the victim was white, we fail to see how counsel could have impeached Kasler with other aspects of his statement. In any event, there is no substantial probability that had counsel pursued this single line of impeachment of Kasler the trial outcome would have been different. Strickland v.Washington, supra.
In his twentieth claim, Coleman contends his trial counsel were ineffective in not effectively impeaching the testimony of James White. During the trial, White testified that Coleman approached him while they were in jail and offered to help get him out on bond if White would help him take care of Ms. Stevens. (Tr. 722). White testified that when he and Coleman got out of jail he and Coleman discussed plans of killing Stevens but he never had any intention of carrying out the plan. (Tr. 725-727). He said Coleman gave him crack cocaine on several occasions during the discussions. (Tr. 725). White said he saw Coleman on the night of the homicide and Coleman said he "took care of his business." (Tr. 730).
Coleman argues that his counsel should have impeached White with his testimony given at Coleman's trafficking trial because at that trial White's recollection was so poor that he was unable to recall how many times he and Coleman talked about "getting rid" of Ms. Stevens. (95-CR-0484 — Tr. p. 326). Coleman notes that at his murder trial White was able to remember that the shooting was to occur on Wiley Avenue. (Tr. 724).
We fail to see how trial counsel was ineffective in impeaching the testimony of White. White testified at the drug trial and at the murder trial that he couldn't remember how many times he and Coleman talked about the plan to kill Stevens. He said "I didn't keep count." (Tr. 735). We fail to see how White's remembering the planned location of the planned killing (Wiley Street) was inconsistent with his inability to remember how many times they had discussed the plan. The trial court properly overruled this claim as well.
In his twenty-first claim, Coleman contends his trial counsel were ineffective in not investigating other suspects who had a similar motive as he had for killing Melinda Stevens. Coleman points to the statement of Charles Foster who was interviewed by Springfield Police shortly after the homicide. In that statement, Foster admitted he told Melinda Stevens she would wind up dead for snitching for the police. (Ex. 3 pages 6, 17). Coleman points out that Shaun Cunigan gave a statement to the police also admitting that he bought drugs from Stevens and he admitted to being in Wiley's alley just prior to the homicide. Coleman points out that "Corky" and "Fat Dean" also bought drugs from Stevens and both were in Springfield at the time of her death. He also points out that Monica Roe told police she and Melinda were riding around with two drug dealers from Dayton on the evening of her death. Coleman also points out that there were reports to police that Ms. Stevens' eleven year old daughter witnessed her mother's killing. (Ex. 17, p. 4).
The trial court overruled this claim because the court found there was overwhelming evidence of Coleman's guilt in the trial record.
Coleman contends counsels' failure to pursue the investigation was particularly egregious given the lack of physical evidence tying him to Stevens' homicide. The Ohio Supreme Court, however, addressed this claim that there was a lack of physical evidence linking Coleman to the crime.
In any event, there was physical evidence and other testimony that reinforced Coleman's admissions that he had killed Stevens. Inmate Donovan Hayes corroborated White's testimony. Fayette, Gaskins, and White all testified to Coleman's obsession to get Stevens. Several witnesses testified that Coleman wore a flannel shirt that evening, with cockleburs stuck on it. Police later found a flannel shirt replete with cockleburs, identified as what Coleman wore that day, abandoned in a doghouse at the Strodeses' residence.
Dr. Stewart, the pathologist, confirmed descriptions given by Coleman to Gaskins and Kasler as to where and how Coleman shot Stevens, i.e., two bullets to the back of the head. Also, the severed vertebrae corroborated Coleman's description that Stevens "drop[ped] like a rock" when she was shot. Furthermore, shells of .380 caliber bullets were found at the scene, and a forensic expert verified that the .380 caliber bullets were likely fired from a Davis P-380, the same type of gun that Coleman told Kasler he used to shoot Stevens. Additionally, Davis P-380 automatics come in chrome models and Hope Strodes saw Coleman with a silver, semi-automatic gun less than an hour before the murder. Given the strength of this evidence, Coleman's claim that a substantial number of leads point to another killer other than Coleman is baseless. Nothing in the record suggests any other killer.
The court also noted that Coleman's trial counsel faced an enormous task in representing Coleman given his propensity to talk to others about how he was going to kill Stevens, and then after the crime how he had in fact done so. Coleman, at 135.
The evidentiary material does indicate that Stevens made drugs buys for the police from other individuals in the Springfield area. These other individuals however did not brag to their friends that they had "taken care of" Melinda Stevens. Also we have examined Ms. Almon's statement (Def. Ex. 17) and nowhere does Ms. Almon state that Melinda's daughter saw her mother shot. Ms. Almon said Rosa told her Lindsay was in Riddle's with her mother before her mother was killed. (Ex. 17, p. 3).
We agree with the trial court's finding that an evidentiary hearing was not necessary to resolve this claim. The evidentiary material does not provide evidence that Coleman was prejudiced by his counsel's conduct. The material does not suggest the reasonable probability that had counsel investigated these "leads" a different trial result would have occurred. The trial court properly overruled the twenty-first claim.
Coleman requested discovery in aid of each of his twenty-one claims. Coleman contended that discovery was necessary because of the insurmountable burden of collecting evidence in support of valid claims prior to the filing of his post-conviction petition. Coleman contended in the trial court that Ohio post-conviction process is rendered meaningless without access to traditional discovery mechanisms. The trial court overruled Coleman's request.
Some courts have held that whether discovery may be had on a post-conviction claim is a matter committed to the sound discretion of the trial court. State v. Wiles (1998), 126 Ohio App.3d 71; State v. Sherills (Jan. 16, 1992), Cuyahoga App. No. 61882. Other courts including this court have held that there are no provisions in the post-conviction statute for a petitioner to obtain discovery. State v. Spirko (1998),127 Ohio App.3d 421; State v. Kinley (1999), 136 Ohio App.3d 1. In Statev. Hooks (October 30, 1998), Montgomery App. Nos. 16978, 17007, this court held there was no constitutional or statutory right to funding of an expert in aid of a post-conviction petition.
Coleman contends in his second assignment that Ohio's post-conviction process fails to comply with the due process and equal protection provisions of the Fourteenth Amendment.
Coleman cites three federal circuit cases which he contends supports his position that Ohio's post-conviction process is inadequate. These cases, however, do not support his argument that discovery is necessary before petitioner demonstrates a threshold justification for an evidentiary hearing. These cases simply demonstrate that collateral relief is often unavailable or effective as a state remedy in Ohio because of the Ohio Supreme Court's application of the doctrine of res judicata to claims which could have been raised on direct appeal. See,State v. Perry (1967), 10 Ohio St.2d 178; see Keener v. Ridenour (1979),594 F.2d 581.
It is fundamental that courts must presume the constitutionality of legislation until the party attacking it has demonstrated that the statute is unconstitutional beyond a reasonable doubt. Coleman has simply failed to demonstrate that to us here. Accordingly, his second assignment must likewise be overruled. The judgment of the trial court is Affirmed.
WOLFF, P.J., and YOUNG, J., concur.